# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Case No. 8:05CR102** |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | **REPORT AND** |
| **BRIAN P. KILKENNY,** ) | **RECOMMENDATION** |
| ) | |
| **Defendant.** ) | |

This case is before the court on the Motions to Suppress (Filings 15 & 16) filed by defendant, Brian Kilkenny. The motions were heard on August 26, 2005 and the transcript of the proceeding (Filing 24) was filed on August 31, 2005. The court allowed the parties additional time to file briefs and the motions were deemed submitted on September 14, 2005.

In his Motion to Suppress Physical Evidence (Filing 15), Kilkenny moves the court for suppression of evidence seized by law enforcement on February 19, 2005. He alleges the stop, search, and seizure of his automobile and person violated his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States of America.

In his Motion to Suppress Statements (Filing 16), Kilkenny moves the court for suppression of any statements, confessions, or admissions made by him on February 19, 2005, alleging they were obtained in violation of his rights under the Fourth, Fifth, and Sixth Amendments to the Constitution of the United States of America.

## FACTUAL BACKGROUND

Bill Maddux testified that he is a 4½ year employee of the Seward County Sheriff's Department currently serving as a deputy sheriff. On February 19, 2005 while driving his patrol vehicle westbound on Interstate 80 in mist and drizzle conditions, he observed a vehicle traveling eastbound following another vehicle too close (6:15-7:3). He turned his patrol vehicle around in the median and caught up with the vehicle. Since he believed the vehicle was still following too close, he timed the distance between the vehicles with his stopwatch (7:10-8:15), and observed an elapsed time of .75 seconds.[1] After noting a violation of the two-second rule (8:24-9:9; 9:11-10:1), he activated his emergency lights and conducted a traffic stop (11:6-12).

Maddux exited his patrol car, approached the vehicle, and made contact with the driver, Brian Kilkenny (6:1-14). He explained that the reason for the stop was following too close and he asked Kilkenny for his driver's license, insurance and registration. He also asked Kilkenny if he would step back and have a seat in the patrol vehicle (12:17-13:3).

After Maddux and Kilkenny were seated in the patrol car, Maddux engaged Kilkenny in a conversation during which Kilkenny gave Maddux his documents (13:13-25). After reviewing the documents, Maddux returned them and informed Kilkenny he was going to issue a warning ticket. Kilkenny stated he understood and signed the warning ticket.

---

[1] While the defendant notes in his brief (p.2) that "there was never any admissible testimony from Deputy Maddux as to the time interval between Kilkenny's vehicle and the vehicle he was following," this assertion is incorrect as the video (Ex. 1) clearly begins with the statement by Maddux that the vehicle is "following too close, .75 on my stopwatch."

Maddux gave Kilkenny a copy of the ticket and told him he was free to go (15:1-5). Maddux testified on cross-examination that he stopped Kilkenny at approximately 8:02 and gave Kilkenny his driver's license and told him he was free to go at 8:12 (38:22-39:9). However, as Kilkenny opened the door to exit, Maddux asked him if he could ask a few more questions, Kilkenny responded, "yeah." (15:6-9). Maddux asked Kilkenny if he had any marijuana, cocaine, methamphetamine, or heroin in the vehicle, Kilkenny responded, "no." (15:11-16:1). Maddux asked Kilkenny if he could search the vehicle, Kilkenny responded, "yeah" or "yes" (16:4-10).[2] Maddux admits that he never gave Kilkenny a written consent to search form (40:18-20).

Maddux testified that he told Kilkenny to remain in the patrol unit, and that if he needed anything to roll down the window or honk the horn (16:11-13; 39:21-40:23). As Maddux walked to Kilkenny's vehicle to conduct the search, he realized he did not have the keys, so he returned to Kilkenny and asked him for the keys to the vehicle. Kilkenny gave him the keys (17:6-15). Maddux returned to the vehicle, opened the trunk, and discovered several bundles he believed contained contraband. He returned to his patrol unit, arrested Kilkenny, placed him in handcuffs and informed him of his *Miranda* rights (17:15-24; 18:20-19:15). Maddux admits that while he advised Kilkenny of his *Miranda* rights, the drug dog was in the patrol unit approximately a foot from Kilkenny and the dog was barking (41:12-25).

---

[2] A review of the videotape (Ex. 1) reveals that the stop of the Kilkenny vehicle occurred at 8:01:05, the warning ticket was signed by Kilkenny at 8:12:43, and Kilkenny gave permission to search at 8:13:20.

Maddux testified that after he concluded his investigation at the scene, he transported Kilkenny to the Seward County jail for booking (19:17-21). At the jail he asked Kilkenny if he remembered the rights that were read to him an hour and a half before, and if Kilkenny still understood the rights. Kilkenny responded, "yes." Maddux then told Kilkenny that the rights were still in effect and asked him if he would be willing to talk to him. Kilkenny responded, "yes." (21:13-24; 43:5-12).

Maddux testified that when he conducts traffic stops for following too close or speeding on the interstate, he normally does not ask for permission to search; however, several things about Kilkenny suggested to him that Kilkenny was involved in criminal activity (23:2-15). Maddux was concerned about the luggage he observed on the rear seat of the vehicle, noting that most people travel with their luggage in the trunk. He was concerned about the Support Our Troops and MIA magnetic ribbons on the side of the vehicle, noting that drug smugglers attempt to use such things to blend in with the innocent motoring public (24:3-18). He was concerned that Kilkenny's travel itinerary made absolutely no sense (24:24-25:1), and that Kilkenny could not provide details of his trip. Specifically, Kilkenny told Maddux that he had driven to Killeen, Texas to visit his son for a day or two, however, he could not provide his son's address. He also told Maddux that while he was in Killeen, he decided to "shoot over to Las Vegas and do a little gambling," however, he could not provide the name of the casino where he stayed. The Las Vegas trip concerned Maddux because he was aware it is approximately 1200 miles from Killeen, Texas

to Las Vegas, Nevada, and to him it was not a place you would go for eight hours just to turn around and come back (25:4-19). Maddux testified that while he was in the patrol unit discussing Kilkenny's travel itinerary, the records check or dispatch check of Kilkenny's paperwork had not been completed (46:6-13).

On cross-examination Maddux admitted that the Support Our Troops and the POW/MIA magnetic ribbons on the Kilkenny vehicle are very common, and since 9/11 are observable on numerous vehicles (27:10-28:18).

Maddux admitted that before he initiated the stop of Kilkenny's vehicle, his patrol unit was traveling in the passing lane to the side and 50 to 100 feet behind the Kilkenny vehicle and that he placed his unit in that position so he could accurately time the following distance with his stop watch (29:24; 30:6-17). Maddux denied that the Kilkenny vehicle could not pass the semi because Maddux's patrol vehicle was in the passing lane, noting that in his opinion there was plenty of room for Kilkenny to signal and move into the passing lane (33:25-34:11). Maddux admitted he is involved in drug interdiction (30:22-24), and that on some days he may stop thirty cars and not conduct a single car search, while on other days he may stop thirty cars and search five (32:10-21). Maddux stated that he has everyone he stops come back to his patrol unit for officer safety and because if he has a question about documents or paperwork, the parties are there to answer (35:13-36:4).

Maddux testified on cross-examination that the reason he stopped Kilkenny was for following too close, under Nebraska statute 60-6,140(1), which states that the driver of a

-5-

motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the conditions of the roadway (33:5-20).

On cross-examination Maddux admitted that he did tell Kilkenny his cooperation was encouraged, that there were some options Maddux could give him to help himself, and that Maddux works closely with the U.S. Attorney and the local county attorney (43:18-44:4). Maddux also admitted telling Kilkenny that he makes recommendations to prosecutors and they are pretty good about following the recommendations (44:5-9). On redirect examination Maddux stated that when he told Kilkenny he makes recommendations, he meant he lets prosecutors know whether a defendant cooperated and how much they cooperated (45:4-10).

On recross examination, Maddux testified that he determined the Kilkenny vehicle had Ohio plates after he caught up to it (48:14-18), but that the Ohio plates were not significant to him (49:21-24).

## LEGAL ANALYSIS

### A.     Probable Cause To Stop

The evidence in this case establishes that on February 19, 2005, Seward County Deputy Sheriff Bill Maddux was traveling on Interstate 80 when he observed Kilkenny's vehicle following a semi. Maddux testified that using the two-second rule, he determined with the aid of a stopwatch that Kilkenny's vehicle was within .75 seconds of the rear of the semi.

The Eighth Circuit in *United States v. Mallari*, 334 F.3d 765, 766-67 (8th Cir. 2003) has stated:

> We have repeatedly held that "any traffic violation, – regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." An officer is justified in stopping a motorist when the officer "objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996); *see Sanders*, 196 F.3d at 913 (officer's mistaken belief, but objectively reasonable basis for believing, that a traffic violation occurred supported traffic stop). Moreover, subjective intent is not determinative in deciding whether the stop as reasonable. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

Neb. Rev. Stat. § 60-6,140(1)[3] provides, "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway." Maddux concluded that Kilkenny's vehicle was traveling closer to the semi than was reasonable and prudent based on the wet road conditions, first by observation and then by applying the two-second rule. The two-second rule has been approved as a basis for determining whether a vehicle is following another too closely, and the circumstances that would justify law enforcement's execution of a stop. *See United States v. Perez*, 200 F.3d 576 (8th Cir. 2000), and *United States v. Gregory*, 302 F.3d 805 (8th Cir. 2002), *cert. denied*, 538 U.S. 992 (2003).

---

[3] While I did not take judicial notice during the hearing of Neb. Rev. Stat. § 60-6,140, I do so now.

I have reviewed the video and while the violation does not appear on the videotape, Kilkenny's vehicle and a semi are depicted. I find Maddux's testimony to be credible. I also note the video reflects that he issued Kilkenny a warning ticket for following too close. The traffic violation provided probable cause for stopping the vehicle. For these reasons, Kilkenny's first claim must be denied.

**B. Scope and Duration of the Traffic Stop**

Having made a valid traffic stop, an officer is allowed to detain the occupants of the vehicle while completing "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000). "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *Id. See also United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004), *cert. denied*, 125 S. Ct. 1879 (2005); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005); *United States v. White*, 81 F.3d 775, 778 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995).

In this case, a review of the videotape shows that these tasks were accomplished in less than eleven minutes, at which time Maddux returned all of defendant's documents and

-8-

indicated the defendant was free to go, and defendant began to exit the patrol car. Not until then did Maddux ask the defendant if he would have time to answer a few more questions. The defendant agreed, at which time Maddux asked him several questions about whether or not he had contraband in the vehicle and asked for permission to search the vehicle.

I find that the defendant was no longer "seized" within the meaning of the Fourth Amendment after Maddux returned his documents, and a reasonable person in defendant's position at the time Maddux asked for further conversation and permission to search would "feel free to terminate the encounter and be on his way." Maddux did not somehow re-seize the defendant by asking if he could talk to him and obtaining permission to do so. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002). Nothing in the record suggests that Maddux acted in such a way that a reasonable person would believe that he was not free to decline the request for further conversation or terminate the encounter altogether. *See id.* Thus, I find that the 11-minute traffic stop was not unlawfully expanded, and that the subsequent contact between defendant and Maddux was consensual. *See, e.g., United States v. White*, 81 F.3d at 779 (after defendant's license and registration were returned and the warning was issued, the encounter "became nothing more than a consensual encounter between a private citizen and a law enforcement officer"); *United States v. Sanchez-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002) (defendant was no longer seized within the meaning of the Fourth Amendment after officer returned his identification and issued a warning ticket).

In the alternative, should the district court find that the continued contact was not consensual, I find that grounds for reasonable suspicion were generated in the course of the initial contact which were sufficient to justify engaging the defendant in conversation after the traffic stop concluded. An officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *See United States v. Poulack*, 236 F.3d 932, 935-36 (8th Cir.), *cert. denied*, 534 U.S. 864 (2001). Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *Id.* In this instance, the defendant was unable to supply basic information about his trip (the address of his son in Texas and where he stayed in Las Vegas) and his 2,400 mile side trip to Las Vegas for an eight-hour stay, provided a basis for further inquiry beyond the original reason for the stop. Kilkenny's second claim must be denied.

### C. Search of the Vehicle

Police may conduct a search of someone's vehicle, home or person without a warrant or probable cause if that person voluntarily consents to the search. *See, e.g., United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether such a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving

consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 892 (1995).  "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)).  "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, 413 F.3d 883, 891 (8th Cir.2005) (quoting *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)).

The recorded conversation between Maddux and the defendant generally corroborates the officer's testimony, as does the verbal consent to search by the defendant.  The consent was not limited in any fashion, not retracted, and not the result of any threat, promise, or inducement by Maddux.  Considering the *Chaidez* factors[4] in conjunction with the videotape

---

[4]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

> "Characteristics of persons giving consent" which may be relevant to the question include:
> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id*. at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:

> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

and the hearing testimony, I find that the defendant voluntarily consented to the search of his vehicle. Kilkenny's third claim must be denied.

### D. Kilkenny's Statements

Defendant contends his statements should be suppressed because (1) he was not properly Mirandized before the interrogation at the jail, and (2) his statements were induced by promises of leniency.

*Miranda* protections are triggered when a defendant is both in custody and being interrogated. *See, e.g., United States v. Hatten,* 68 F.3d 257, 261 (8th Cir. 1995). The statements in question all involved custodial interrogation.

Kilkenny first relies on the existence of the one and one-half hour delay between his *Miranda* advisory at the scene of the traffic stop and his interrogation at the jail. The record shows that Kilkenny was advised of his *Miranda* rights at the site of the traffic stop. Maddux then transported Kilkenny to the Seward County jail for booking. At the jail Maddux asked Kilkenny if he remembered the rights that were read to him an hour and a half before, and if Kilkenny still understood the rights. Kilkenny responded that he did. Maddux then told Kilkenny that the rights were still in effect and asked him if he would be willing to talk to him. Kilkenny responded that he would be willing. Under these circumstances, I find that

---

*Id.* (internal citations omitted). The factors should not be applied mechanically, *id.*, and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

*United States v. Bradley*, 234 F.3d at 366.

-12-

Maddux was not required to advise Kilkenny of his *Miranda* rights a second time. *See United States v. Boyd*, 180 F.3d 967, 977 (8th Cir. 1999) (statements made following a one to two hour time interval were covered by previous *Miranda* warnings); *United States v. Cajas-Maldonado*, 13 Fed. Appx. 469, 475 & n.7 (8th Cir. 2001).

The government bears the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of this case, Kilkenny's waiver of his *Miranda* rights was "an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege." *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005). "To determine whether a waiver or a confession was voluntary, a court looks at the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). The court must examine both "'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" *Id.* (quoting *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)).

> To state the obvious, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." ... [T]he fact that the tactics produced the intended result ... does not make [a] confession involuntary." ... In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." ... "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" ... Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect ..., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary.... Rather, the coercive conduct must be "such that the

defendant's will was overborne and his capacity for self-determination critically impaired."

*United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (citations omitted).

Kilkenny argues that his *Miranda* waiver was improperly induced by Maddux's comments that his cooperation was encouraged and Maddux would make Kilkenny's cooperation known to the prosecutor; however, "promises to bring the defendant's cooperation to the attention of the prosecutor do not render a confession involuntary." *United States v. Walker*, 272 F.3d 407, 412 (7th Cir. 2001), *cert. denied*, 535 U.S. 979 (2002). A promise of leniency, does not in itself render a statement involuntary. *See, e.g., United States v. Otter*, 197 F.3d 316, 318 (8th Cir. 1999).

I find that, based upon the analysis of the circumstances surrounding Kilkenny's statements, the statements were voluntarily made. I find no evidence in the record that Kilkenny's will was overborne or of any coercive police conduct that would render the statements inadmissible. Kilkenny's fourth claim must be denied.

## RECOMMENDATION

For the reasons discussed herein,

**IT IS RECOMMENDED:**

1. that Kilkenny's Motion to Suppress Physical Evidence (Filing 15) be denied and

2. that Kilkenny's Motion to Suppress Statements (Filing 16) be denied.

Pursuant to NELR 72.4, any objection to this recommendation may be made by filing a "Statement of Objection to Magistrate Judge's Recommendation" within 10 days after being served with a copy of the recommendation. The statement of objection shall specify those

portions of the recommendation to which objection is made and the basis of the objection. The objecting party shall, at the time of filing the objection, file a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.

**DATED October 12, 2005.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**